# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | Criminal Action No. 1:09-cr-0078 |
| v. | : | |
| | : | (Chief Judge Kane) |
| KAREEM OWENS, | : | |
|     Defendant | : | |

## MEMORANDUM

Before the Court is Defendant Kareem Owens's motion to suppress evidence. (Doc. No. 253.) Defendant moves to suppress evidence found in vehicles in which he was traveling at the time of two unrelated traffic stops. For the reasons that follow, the motion will be denied.

## I. BACKGROUND[1]

The facts in this case arise from two independent motor vehicle stops and subsequent searches. The first stop occurred on February 5, 2008; the second, on February 27, 2009. In each case, Defendant was a passenger in the vehicle at the time of the search and seizure.

On February 5, 2008, Defendant was traveling as a passenger in a Ford Windstar minivan. At approximately 2:30 a.m., Corporal Steven Prisbe ("Corporal Prisbe") of the Harrisburg City Police Department observed the Windstar stopped in the roadway of the 1400 block of Catherine Street in the Allison Hill area of Harrisburg. The roadway is a one-way street in a residential area, with parked cars lining both sides of the street. After observing the van remain stationary with the ignition on for approximately two minutes, Corporal Prisbe pulled up

---

[1] The Court held an evidentiary hearing to determine the disputed facts. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996) (holding that Federal Rule of Criminal Procedure 12 requires the Court to hold an evidentiary hearing on a defendant's motion if the claim is colorable and material facts are in dispute); United States v. Juarez, 454 F.3d 717, 720 (7th Cir. 2006). The following factual account represents the facts the Court credits upon consideration of all testimony and evidence presented during the evidentiary hearing held December 14, 2009.

behind it in his marked patrol car. Immediately thereafter, the van proceeded slowly, approximately ten to fifteen miles per hour, down the street. Though the speed limit was not visibly posted, Corporal Prisbe testified that the speed limit on the roadway was twenty-five miles per hour. After following the car for approximately three blocks and observing it occasionally drift from side to side across the single-lane roadway, Corporal Prisbe activated his emergency lights to effect a traffic stop. The vehicle unsuccessfully attempted to pull into two or three parking spaces prior to eventually parking in an illegal parking spot. Suspecting that the driver was under the influence of alcohol, Corporal Prisbe called for backup prior to approaching the vehicle.

As Corporal Prisbe approached the vehicle, the driver opened the window and yelled that he did not have a driver's license. Despite the lack of identification, Corporal Prisbe ascertained the driver's name, Winston McCollough ("McCollough"), and the names of the two other occupants of the vehicle. Defendant Kareem Owens was one of the passengers in the vehicle. The driver also informed Corporal Prisbe that he could locate the owner of the vehicle, Toyana Anderson.

Corporal Prisbe then contacted Anderson, confirmed that she was the owner of the vehicle, and explained what had transpired. He explained to Anderson that she could be charged for "permitting violation of title under the Pennsylvania vehicle code," and that the car was in danger of being towed. Anderson arrived at the scene, and Corporal Prisbe requested her permission to search the vehicle "to protect her rights" so she would not "inherit something" the previous occupants had left in the vehicle. She gave consent to search the vehicle. Corporal

Prisbe recovered a loaded handgun, a holster, and "a quantity of crack cocaine" from the rear seat of the van.

Just over a year later, on February 27, 2009, a 1999 red or maroon Mercedes Benz was stopped for speeding while traveling southbound on Interstate 81 by Pennsylvania State Police Trooper Anthony Todaro ("Trooper Todaro"). Drug Enforcement Administration ("DEA") Agent Keith Kierzkowski had instructed Trooper Todaro to survey the area for a vehicle of that description and to pull the car over for a traffic violation if the situation presented itself. A confidential informant working with the Dauphin County Drug Task Force had provided information to Agent Kierzkowski that a 1999 red or maroon Mercedes Benz would be returning from New York, specifically, the Bronx, to the Harrisburg area transporting approximately 100 grams of heroin in the late hours of February 26, 2009 or very early morning hours of February 27, 2009. The confidential informant had previously made controlled purchases of heroin from a suspected drug dealer, Omar Davenport, and it was Davenport who provided the information about the drug purchase to the confidential informant. The confidential informant also specified that Bobbie Sue Miller would be driving the vehicle. Though Agent Kierzkowski had attempted to conduct electronic surveillance of the vehicle, the technology failed, prompting Agent Kierzkowski to organize a dedicated surveillance team to physically monitor the vehicle as it traveled along Interstate 81. He instructed the surveilling officers, including Trooper Todaro, to pull the car over if they noted a traffic violation.

When a vehicle fitting the above description passed Trooper Todaro, he attempted to clock the speed, but was initially unable to determine the vehicle's speed because a commercial truck impeded his radar. Trooper Todaro then pulled onto the highway behind the Mercedes and

was able to determine that it was traveling 85 miles per hour in a 65 mile per hour speed zone. Trooper Todaro initiated a traffic stop by activating his overhead lights and siren. The vehicle pulled over to the side of the road, and the driver, Bobbie Sue Miller, surrendered her driver's license and registration. Trooper Todaro smelled a very strong odor of air freshener, but saw no other visible indication of narcotics in the vehicle.

After checking Miller's license and registration in his patrol vehicle, Trooper Todaro returned to the car and asked Miller to exit the car. Once they were at the rear of the vehicle, Trooper Todaro advised Miller that she was receiving a warning notice for her violation, and he began to prepare the notice while engaging her in conversation. He inquired about the other occupants of the vehicle and her reasons for traveling that morning. Miller hesitated to identify the other passengers in the car, stammering before indicating that her cousin, "Brittany Smith," occupied the passenger's seat. She said she could not recall the name of Defendant, located in the backseat, but she identified him as "Brittany's boyfriend." Trooper Todaro inquired further about the passengers in the car and their reasons for traveling prior to giving Miller the warning notice and returning her driver's license. Todaro finished writing the citation but did not inform Miller that she was free to leave, retaining control of her registration documents. Instead, he instructed Miller to remain at the rear of the vehicle while he checked the registration against the VIN number on the dashboard.

While back at the front of the car, Todaro asked "Smith" if she would answer a few questions. She responded that her name was Brittany Vasquez, that she was the driver's friend, not cousin, and that she did not know Defendant's name but that he was a friend of Miller's. Her reasons for traveling that morning also differed greatly from those given by Miller. It was not

4

until after questioning Vasquez that Trooper Todaro returned to the rear of the car, explained the warning notice to Miller, and advised her that she was free to leave.

Though Miller immediately turned to leave, Trooper Todaro asked if she would answer a few more questions prior to her departure, and she agreed. He asked her whether there were any loaded weapons or drugs in the vehicle. She "replied in the negative." Trooper Todaro then asked her specifically whether certain types of drugs were in the car, *i.e.* marijuana, cocaine, heroin, or methamphetamine. Miller reacted nervously. She "shook her head from left to right quite wildly, said no . . . [and] glanced back toward the vehicle[,] . . . breaking eye contact . . . [and] shifting her body weight from left to right." She also dropped her driver's license and "requested permission to reach over . . . to pick it up." Trooper Todaro requested permission to search the vehicle, and Miller consented. Defendant and Vasquez were removed from the car, patted down, and the vehicle was searched. A clear plastic bag containing a brownish powdery substance believed to be heroin was found between the right front seat and center console of the car.

## II. DISCUSSION

Defendant moves to suppress physical evidence taken at the time of each stop. Specifically, he argues that in each instance his seizure was unlawful. With regard to the February 5, 2008 stop, he contends that the Government lacked reasonable suspicion to detain the vehicle in the first instance, and thus all evidence recovered from the consensual vehicle search was fruit of the poisonous tree. Defendant challenges the February 27, 2009 stop on the basis that the length of the detention and the scope of the questioning used by Trooper Todaro exceeded the scope of a traffic stop, thereby creating an unlawful seizure that requires that all

evidence found after that time be suppressed. The Court will address each seizure in turn, but will commence with a brief discussion of Defendant's standing to seek suppression of evidence found within a vehicle he neither owned nor possessed at the times of the stops.

### A. Standing

The Government contends that Defendant, as a passenger in each vehicle without ownership or control at the time of the stop, lacks standing to challenge the legality of the searches. The Government is correct that "passengers are generally held to lack 'standing' to object to evidence discovered in a search of a vehicle" because they do not have a reasonable expectation of privacy in a car they neither own nor control. United States v. Mosley, 454 F.3d 249, 253-54 (3d Cir. 2006) (distinguishing claims by passengers challenging the illegal search of the vehicle from passengers challenging the illegal seizure of the vehicle and holding that the latter have standing). But that does not end the matter because Defendant here challenges the legality of his *seizure*. Defendant contends that the stops were illegal seizures of his person, and thus all evidence obtained therefrom should be suppressed under the fruit of the poisonous tree doctrine.

Defendant is correct that he has standing to challenge his seizures and that, if illegal, evidence obtained as the result of such seizures may be suppressed as the product of the illegal seizures. In Mosley, the Third Circuit considered a closely related question and stated that "it is settled law that a traffic stop is a seizure of everyone in the vehicle . . . [t]hus passengers of an illegally stopped vehicle have 'standing' to object to the stop." Mosley, 454 F.3d at 253. The Supreme Court approved the Third Circuit's holding in Mosley. See Brendlin v. California, 551 U.S. 249, 258 (2007) ("A traffic stop necessarily curtails the travel a passenger has chosen just

as much as it halts the driver."). In Brendlin, the Supreme Court held that all passengers in a car stopped for a traffic violation are seized for Fourth Amendment purposes. Id. at 255. Because a passenger is seized during a traffic stop to the same extent a driver is, the Supreme Court further ruled that passengers have standing to seek suppression of evidence obtained after an illegal seizure under the fruit of the poisonous tree doctrine. Id.

Accordingly, Defendant has standing to object to the seizures of his person during the traffic stops and to seek suppression of evidence obtained as a result of those stops.

      **B.**      **February 5, 2008 Stop**

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. Const. amend. IV. A traffic stop constitutes a seizure, and thus must be deemed reasonable to avoid running afoul of the Fourth Amendment. Brendlin, 551 U.S. at 258; Mosley, 454 F.3d at 253 ("It is settled law that a traffic stop is a seizure . . . ."). To be consistent with the Fourth Amendment, however, an officer need only have reasonable, articulable suspicion that a vehicle has committed criminal activity to make a stop. United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). Any "technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." Mosley, 454 F.3d at 252. The standard of reasonable suspicion requires only a "minimal level of objective justification," Delfin-Colina, 464 F.3d at 396, when looking at the totality of the circumstances as they were available to the officer prior to the stop. United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006) ("In evaluating whether there was an objective basis for reasonable suspicion, we consider the totality of the circumstances - the whole picture.") (internal citations omitted). Much deference should be given to an officer's knowledge "of the nature and nuances of the type of criminal activity" in

7

determining whether the reasonable suspicion standard has been met. United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003).

In this case, the facts indicate that Corporal Prisbe observed a Ford Windstar minivan stopped on a one-way street in a residential area for a period of approximately two minutes. The car made no movement, though the driver remained in the vehicle and the ignition remained on. Corporal Prisbe testified that in his experience, intoxicated drivers will stop the vehicle, unable to drive forward because they have "one foot on the pedal, one foot on the break." When the patrol car approached the vehicle, it proceeded along the roadway, but at an uncommonly slow rate. Moreover, the vehicle proceeded down the road in a "drifting pattern," unsuccessfully attempting to park in two or three spaces before determining to park in an illegal zone.

Though the observations may support some other conclusion equally well, the Court finds that Corporal Prisbe's observations, including the vehicle's lengthy stop in the roadway, its slow, wavering procession forward, the hour of night, and the driver's inability to adequately park the vehicle, support a reasonable suspicion that the driver was driving under the influence of alcohol. Accordingly, the vehicle was stopped on reasonable suspicion, Defendant's seizure was lawful, and the drugs and weapon found in the car beneath Defendant's seat will not be suppressed.

      C.      **February 27, 2009 Stop**

With respect to the February 27, 2009 traffic stop, Defendant does not dispute that the initial seizure for speeding was lawful. Instead, he argues that the seizure became unlawful because the scope of the seizure extended beyond that which is reasonable for a speeding violation. The Government argues that the stop was reasonable under the totality of the

circumstances, which included a tip from a confidential informant indicating that drugs were in the vehicle.

As stated above, it is clear that "any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." Mosley, 454 F.3d at 252. Yet, a traffic stop seizure may become unlawful "if [the stop] is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). In other words, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Id. The scope of the seizure "must be carefully tailored to its underlying justification," and the Government bears the burden to "demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500 (1983). Yet, an officer may inquire into matters unrelated to the stop without making the seizure unlawful "so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, — U.S. —, 129 S.Ct. 781, 788 (2009). Beyond that, the police may lawfully "escalate the encounter by visually inspecting the interior of the car and checking credentials and asking questions of the occupants." Mosley, 454 F.3d at 252. The Third Circuit has further explained that:

> After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.

Givan, 320 F.3d at 458.

9

In this case, Trooper Todaro unquestionably had authority to stop the vehicle for speeding. The lawful stop also entitled him to check the credentials of the driver as well as to ask questions of the driver pertinent to the traffic stop. Trooper Todaro lawfully questioned Miller briefly about her identity, the identity of the passengers, where the car was traveling, and its reasons for speeding prior to terminating the stop. These questions did not extend the duration of the stop beyond that of an average traffic stop. Yet, the record reflects that Trooper Todaro did not terminate the stop until after he questioned Miller and Vasquez both about their relationship to each other and Defendant and inquired as to Vasquez's reasons for traveling that day. Although the questions initially posed to Miller are sufficiently related to the speeding violation to be within the scope of the initial stop, Trooper Todaro's extended questioning of her about her relationship to the other parties in the vehicle and the entirety of his questioning of Vasquez is arguably an extension of the stop beyond that which was acceptable for a traffic violation. It is undisputed that the traffic stop did not terminate until after Trooper Todaro had questioned Vasquez and returned to Miller to inform her that she was free to leave. Nonetheless, the Court finds that Trooper Todaro's questions to Miller and Vasquez did not exceed the scope of a lawful seizure.

In assessing the totality of the circumstances, it is essential to consider that Trooper Todaro's knowledge at the time of the stop was not limited to evidence that the vehicle had violated the speed limit. Trooper Todaro was aware that a known confidential informant had provided information that a 1999 red or maroon Mercedes Benz would be traveling southbound from New York in the evening hours of February 26, 2009 or the morning hours of February 27, 2009, with a large quantity of heroin. The tip identifying a car of that description, the matching

registration of the vehicle to the tip, the scent of excessive air freshener, Miller's hesitancy to identify the other occupants of the vehicle, and Miller's nervous demeanor sufficiently provided Trooper Todaro with reasonable suspicion that drug activity was underway.

Moreover, Trooper Todaro did not extend the scope of the stop simply by questioning Miller about her reasons for traveling and the identity of the other passengers in the car, because those questions occurred while he was still filling out her citation. Thus without extending the stop, he was able to ascertain that she did not know the other passengers in her vehicle. Trooper Todaro testified that, in his experience, if passengers in a vehicle don't know each other, they are more likely to be involved in criminal activity. This evidence, combined with the tip and the strong scent of air freshener, sufficiently justified Trooper Todaro's limited escalation of the stop—his questioning of Vasquez to see if her story corroborated Miller's. When the stories did not align, Trooper Todaro terminated the stop and informed Miller she was free to leave.

Because a confidential informant's tip contributed to Trooper Todaro's reasonable suspicion of drug activity in this case, it is necessary to consider the reliability of the tip. Where reasonable suspicion is provided primarily by a confidential informant, a court must consider "both the reliability of the tip or informant and the content of the tip." Goodrich, 450 F.3d at 560; see also United States v. Valentine, 232 F.3d 350, 355 (3d Cir. 2000) ("The reliability of a tip, of course, is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances."). The content of a tip is sufficient if it provides "a particularized and objective basis for suspecting (1) the particular persons stopped (2) of criminal activity." Goodrich, 450 F.3d at 560 (citing Florida v. J.L., 529 U.S. 266, 272 (2000)).

The evidence on the record satisfies the Court that the informant was trustworthy and reliable. Agent Kierzkowski stated that the confidential informant had previously conducted controlled purchases from the source of the tip, Owen Davenport. The informant's successful prior controlled purchases thus not only indicated that the informant was trustworthy, but also leant credibility to the tip because the agents were assured that the source of the informant's tip, Davenport, was knowledgeable about drug transactions. Moreover, the content of the tip was specific in that it identified the type of car to be used, the approximate time and place the transaction would occur, the driver of the car, the registration of the vehicle, and the type of drug that was being transported. The tip, combined with Miller's hesitancy or inability to identify the other passengers in the car and the strong scent of air freshener, provided Trooper Todaro reasonable suspicion to extend the stop to question the driver and another occupant of the car in the limited manner he did to determine whether drug activity was underway.

The Court finds that the seizure did not exceed the scope necessary to obviate Trooper Todaro's reasonable suspicion that the vehicle contained narcotics. Accordingly, the motion to suppress evidence found as a result of the February 27, 2009 stop will be denied.

### III. CONCLUSION

For the foregoing reasons, the Court finds that Defendant's motion to suppress will be denied.

An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **Criminal Action No. 1:09-cr-0078** |
| **v.** : | |
| : | **(Chief Judge Kane)** |
| **KAREEM OWENS,** : | |
|     Defendant : | |

## **ORDER**

**AND NOW**, this 8th day of January 2010, upon consideration of Defendant's motion to suppress evidence (Doc. No. 253), **IT IS HEREBY ORDERED** that the motion is **DENIED**.

                                                   S/ Yvette Kane
                                                 Yvette Kane, Chief Judge
                                                 United States District Court
                                                 Middle District of Pennsylvania